## No. 5768.

STATE OF LOUISIANA VS. CHARLES CLINTON, AUDITOR, AND ANTOINE DUBU-
CLET, TREASURER. WILLIAMS & GUION, INTERVENORS.*

The State has enjoined the Auditor and Treasurer from paying the coupons attached
to the bonds issued under act No. 95 of 1871, on the grounds that the issue of said
bonds, amounting to two million five hundred thousand dollars, was in contra-
vention of the constitutional amendment, and said bonds are not valid obliga-
tions of the State. To decide this question it is necessary to examine the acts of
1869, 1870, and 1871 which were passed on the subject.

The obligation of the State under the acts of 1869 and 1870 adverted to was to guaran-
tee the second-mortgage bonds of the New Orleans, Mobile, and Chattanooga
Railroad Company on each section of forty miles "*which said company shall con-
struct*" within the time mentioned in said acts, after the act of mortgage on said
section so constructed shall have been delivered to the Governor, approved by
him, and recorded in the office of the Secretary of State.

This was the subsisting obligation of the State when the constitutional amendment
limiting the State debt to twenty-five million dollars went into operation in No-
vember, 1870. As the amount of that limitation had already been reached, the
General Assembly could not create a debt thereafter.

Notwithstanding the existence of this constitutional limitation, the General Assem-
bly passed act No. 95, approved the twentieth of April, 1871, which provides,
among other things, that the Governor is authorized to subscribe for twenty-five
thousand shares of one thousand dollars each of the capital stock of said corpo-
ration on behalf of the State, and to receive the certificate of stock therefor as
payment shall be made for the same, etc., and further declares that the subscrip-
tion for stock and the issue of the bonds aforesaid are intended to extinguish
the obligation of the State to indorse or guarantee the second-mortgage bonds
of said corporation under the act of the General Assembly relative to said cor-
poration, approved February 21, 1870, and as a discharge of either party from all
obligations for the issue, indorsement, guarantee, and security of said mortgage
notes, as provided for in the fourth section of said act; it is provided that the said
corporation shall comply with certain conditions, formalities, and stipulations;
and shall obligate itself to commence that part of its railroad from Vermilion-
ville to Shreveport within six months, and to complete the same within the time
limited therefor in the said act.

On the twenty-fourth of April, 1871, four days after the passage of this act, the Gov-
ernor issued to said company bonds of the State amounting to two million five
hundred thousand dollars, notwithstanding the fact that the railroad from Ver-
milionville to Shreveport had not been located, and not a particle of work had
been done by the said company.

Indeed, the record shows that there never has been even a survey and location of
that branch of the railroad as contemplated by the act, and all the work that has
ever been done by said company thereon consists of a ditch 291 feet long, six
feet wide, and one and a half deep, proved to be worth twelve dollars. That is
the extent of the labor of said company on the road from Vermilionville to
Shreveport after the expiration of five years, the period within which they were
required to finish the whole line.

The obligation of the State to guarantee the second-mortgage bonds of the New Or-
leans, Mobile, and Chattanooga Railroad Company had lapsed, because the said
company failed to complete the first section of forty miles of the main line by
the eighteenth of January, 1871, and failed to achieve other works and fulfill other
obligations according to specifications in said act of 1870.

Under these circumstances the act of the twentieth of April, 1871, and the issue
thereunder by the Governor of bonds to the amount of two million five hundred
thousand dollars was the creation of a debt in contravention of the constitu-
tional limitation which went into force in November, 1870.

The conditions precedent having not happened, the conditional obligation of the
State resulting from the legislation of 1869 and 1870 has not ripened into an

32                                              ᵢ

unconditional obligation; it can never ripen into one, because the period within which it might become so by the performance of the conditions imposed on said company have all passed, and the conditional obligation of the State to said company has lapsed.

As these bonds bear date subsequent to the adoption of the constitutional amendment, all persons acquiring them were charged with notice of the existence and effect of that amendment; they were charged with notice that in 1871 it was not in the power of the General Assembly and the Governor to bind the State by the issue of these bonds as a substitute for the obligation to indorse the second-mortgage bonds of the New Orleans, Mobile, and Chattanooga Railroad Company, because said obligation was conditional, and it could only become binding on the State upon the happening of the conditions precedent, and they might never happen.

The issue of these bonds as a substitute for a debt that did not exist, and that might never exist, was to all intents and purposes the creation of a debt in 1871, in contravention of the constitutional amendment.

APPEAL from the Superior District Court, parish of Orleans. *Hawkins*, J. *A. P. Field*, Attorney General, *Henry C. Dibble*, Assistant Attorney General, *J. B. Cotton*, and *J. Q. A. Fellows*, for plaintiff and appellee. *Kennard, Howe & Prentiss*, for intervenors and appellants.

WYLY, J. The State enjoined the Auditor and Treasurer from paying the coupons attached to the bonds issued under act No. 95 of 1871, on the ground that the issue of said bonds, amounting to $2,500,000, was in contravention of the constitutional amendment, and said bonds are not valid obligations of the State.

The New Orleans, Mobile, and Chattanooga Railroad Company intervened.

The case was before this court in 1874, and it was remanded. Before the trial on the remandment, Williams & Guion, holding certain bonds of this issue, intervened, setting up their right as third holders to obtain payment of the coupons and to have their bonds declared valid.

The court perpetuated the injunction and decreed said bonds to be void. Thereupon the intervenors, Williams & Guion, appealed.

It will be necessary to examine the provisions of the acts of 1869, 1870, and 1871 in order to determine whether the bonds in question are valid. By act No. 26 of 1869 it was provided the New Orleans, Mobile, and Chattanooga Railroad Company shall complete the first section of forty miles within one year from the survey and location, and the whole road to Houston, Texas, within three years and six months from the survey and location, eight months being allowed for making the survey and location; "and in case of the failure of said company to survey, locate, and construct the said main line of said railroad within the State of Louisiana, in the manner and within the time limited in this section of this act for such survey, location, and construction, the obligation of the State of Louisiana, by virtue of this act, to guarantee the second-mortgage bonds of said company (as in this act provided) for or upon that portion of the said main line of railroad not constructed within the time

limited, *shall cease and determine,* and none of said second-mortgage bonds for or upon that portion of said main line of railroad, not constructed within the time limited, shall be guaranteed by the State of Louisiana. But no failure of the company to complete said railroad shall effect or forfeit the rights of said company to maintain and enjoy such portions of its railroad as it shall have completed, nor any other rights or franchises secured to said company under its charter, or by the laws of the State of Louisiana, or of any other State relating thereto."

By act No. 31 of 1870 it is provided, among other things, "that the said company be and is hereby empowered and authorized to locate, construct, and build, and thereafter to own, maintain, manage, and use a railroad with one or more tracks and suitable turnouts, from any point upon the main line of its railroad, as the same has been or may hereafter be located in the parish of St. Martin, or in the parish of Lafayette, northwesterly, on such a course or route as the directors of said company may deem most expedient and for the interest of said company to adopt, toward and to Shreveport, in the parish of Caddo, via Alexandria, in the parish of Rapides;  *  *  *  provided, however, that such of the provisions of the act entitled 'an act to expedite the construction of the New Orleans, Mobile, and Chattanooga Railroad Company in the State of Louisiana,' approved February 17, 1869, as relate to the guarantee of the second-mortgage bonds of said company shall be applicable only to such parts or portions of the said lines of railroad to Shreveport, and to said point in the parish of West Baton Rouge, as shall be surveyed, located, and constructed within five years from the acceptance of this act by said company; and said provisions of said act shall be applicable to such parts or portions of the said last-mentioned lines of road as shall be surveyed, located, and constructed within the time last aforesaid."

But what are the provisions of the act of the seventeenth of February, 1869, which relate to the guarantee of the second-mortgage bonds of said company? As they are made applicable to the branch road to be extended to Shreveport, it is important to determine the obligation of the State arising from said provisions.

Section one of said act provides that "the New Orleans, Mobile, and Chattanooga Railroad Company, a corporation of the State of Alabama, be and is hereby authorized to make and issue, from time to time, as hereinafter provided, its bonds to be known as 'second-mortgage bonds of the New Orleans, Mobile, and Chattanooga Railroad Company, guaranteed by the State of Louisiana,' of such denominations as the company may elect, but to an amount not exceeding in the aggregate twelve thousand five hundred dollars for each and every mile in length of the main line of its railroad, westerly from the city of New Orleans and within the State of Louisiana, which said company shall construct."  *  *  *

Section seven provides that the said mortgage after it has been executed shall be delivered to the Governor, and, if the same be in conformity with the provisions of this act, he shall indorse his* approval in writing thereon and cause the said mortgage thus approved to be recorded in the office of the Secretary of State.

Section eight provides that "when the said second mortgage shall have been so delivered, approved, and recorded, *and one continuous portion or section of forty miles* in length of said main line of railroad, within the State of Louisiana, *shall have been constructed by the company and the rails laid thereon*, the company may deliver to the Governor of the State of Louisiana five hundred thousand dollars, or one hundred thousand pounds sterling, of such second-mortgage bonds, *and the Governor shall thereon subscribe a certificate*, to be written or printed on each of said bonds in the following words : 'The payment of the principal of the within bond when due, and of the interest thereon when it accrues, is guaranteed by the State of Louisiana, pursuant to the provisions of the act of the General Assembly of said State authorizing such guarantee,' and shall affix the great seal of the State of Louisiana to such certificate, and the said seal shall be attested by the signature of the Secretary of State, *and the bonds shall then be delivered to the company for its general uses and purposes* authorized by its charter."

Section nine provides that "*upon the construction of each additional section* or portion of forty miles in length of said main line of railroad, within the State of Louisiana, *the company may execute and deliver to the Governor of the State of Louisiana a further amount of such second-mortgage bonds*, equal to twelve thousand five hundred dollars or two thousand five hundred pounds sterling, as the company may elect, for each and every mile in length of said main line of railroad," *and thereupon the Governor shall subscribe a certificate of guarantee*, etc.

The obligation of the State under the acts of 1869 and 1870 adverted to was to guarantee the second-mortgage bonds of the New Orleans, Mobile, and Chattanooga Railroad Company on each section of forty miles "*which said company shall construct*" within the time mentioned in said acts, after the act of mortgage on said section so constructed shall have been delivered to the Governor, approved by him, and recorded in the office of the Secretary of State.

This was the subsisting obligation of the State when the constitutional amendment limiting the State debt to $25,000,000 went into operation in November, 1870.    As the amount of that limitation had already been reached, the General Assembly could not create a debt thereafter.    Notwithstanding the existence of this constitutional limitation, the General Assembly passed act No. 95, approved the twentieth of April, 1871, which provides, section one, that "the Governor · of this State be and he is

hereby authorized to subscribe for twenty-five thousand shares of one thousand dollars each of the capital stock of said corporation on behalf of this State, and to receive the certificates of stock therefor as payment shall be made for the same, which certificates shall be deposited by him in the office of the Treasurer of this State, and shall not be assignable or transferable, except by the authority of the General Assembly. That, whereas the subscription for stock and the issue of bonds therefor herein provided for are intended to extinguish the obligation of the State to indorse or guarantee the second-mortgage bonds of said corporation under the act of the General Assembly relative to said corporation, approved February 21, 1870, and as a discharge of either party from all obligations for the issue, indorsement, guarantee, and security of said mortgage bonds as provided in the fourth section of said act, the said corporation shall be required, at or before the complete issue of the said bonds, to file with the Secretary of State a full release and acquittance of the obligation of the State so created to guarantee said mortgage bonds and for which the provisions of this act are designed as a substitute and discharge; and the said corporation shall, by its express agreement made and entered into by the vote of its board of directors, and attested by its seal and the signature of its secretary, obligate itself to commence that part of its railroad from Vermilionville to Shreveport within six months, and to complete the same within the time limited therefor in the said act of the General Assembly."

On the twenty-fourth day of April, 1871, four days after the passage of this act, the Governor issued to said company bonds of the State amounting to $2,500,000, notwithstanding the fact that the railroad from Vermilionville to Shreveport had not been located and not a particle of work had been done by said company.

Indeed, the record shows that there never has been a survey and location of that branch of the railroad, as contemplated by the act, and all the work that has ever been done by said company thereon consists of a ditch 291 feet long, six feet wide, and one and a half deep, proved to be worth twelve dollars. That is the extent of the labor of said company on the road from Vermilionville to Shreveport after the expiration of five years, the period within which they were required to finish the whole line to Shreveport.

The obligation of the State to guarantee the second-mortgage bonds of the New Orleans, Mobile, and Chattanooga Railroad Company has lapsed, because the said company failed to complete the first section of forty miles of the main line by the eighteenth day of January, 1871; they failed to complete any of the other sections of the said main line within three years after the survey and location, and they failed to survey, locate, construct, and put in running order any part of the branch road

from Vermilionville to Shreveport within five years, as specified in the said act of 1870.

Under the circumstances, was not the act of April 20, 1871, and the issue thereunder by theGovernor ofbonds to the amount of two million five hundred thousand dollars, the creation of a debt in contravention of the constitutional limitation then in force ? In our opinion it was. When the constitutional limitation went into force, in November, 1870, the State was under an obligation to guarantee second-mortgage bonds on sections of forty miles, if properly completed on the main line and on the branch line to Shreveport. It was under no obligation to guarantee second-mortgage bonds on uncompleted sections or portions of said lines of railroad. If the sections should be completed and the rails laid within the time and manner specified in said acts of 1869 and 1870, and the mortgage to the State should be approved by the Governor and registered in the office of the Secretary of State, then the State would be under obligation to guarantee said second-mortgage bonds.

The conditions precedent have not happened; the conditional obligation of the State resulting from the legislation of 1869 and 1870 has not ripened into an unconditional obligation; it can never ripen into an unconditional obligation, because the periods within which it might become so by the performance of the conditions by said company have all passed, and the conditional obligation of the State to said company has lapsed. Yet the State is now called upon to discharge the alleged obligation resulting from the issue by the Governor under act of the twentieth of April, 1871, of bonds amounting to two million five hundred thousand dollars in contravention of the constitutional amendment then in force.

As there is now no obligation resulting from the acts of 1869 and 1870 in regard to the State guaranteeing second-mortgage bonds of said company, there is no debt due said company or those holding under it. As the bonds in suit do not represent a debt incurred prior to the constitutional amendment, for there was none, they merely evidence a debt contracted since then and in violation of said amendment. Neither the Governor nor the General Assembly had authority in 1871 to issue two million five hundred thousand dollars of State bonds in payment of a subscription for stock then made. Nor had they authority to substitute bonds of the State, unconditional obligations, for the conditional obligation arising from the legislation of 1869 and 1870 prior to the happening of the conditions precedent in said act.

As these bonds bear date subsequent to the adoption of the constitutional amendment, all persons acquiring them are charged with notice of the existence and effect of that amendment; they are charged with notice that in 1871 it was not in the power of the General Assembly and the Governor to bind the State by the issue of these bonds as a substitute

for the obligation to indorse the second-mortgage bonds of the New Orleans, Mobile, and Chattanooga Railroad Company, because said obligation was conditional, and it could only become binding on the State upon the happening of the conditions precedent, and they might never happen. The issue of these bonds as a substitute for a debt that did not exist, and that might never exist, was to all intents and purposes the creation of a debt in 1871, in contravention of the constitutional amendment.

It is therefore ordered that the judgment herein perpetuating the injunction and declaring void the bonds issued under act No. 95 of the acts of 1871, amounting to two million five hundred thousand dollars, be affirmed, appellants paying costs of appeal.

———

TALIAFERRO, J., *concurring.* The bonds were issued without the authority and against the authority of the State, which had prohibited the increase of the public debt. The State through its amendment to the constitution in 1870 peremptorily forbade such increase. The Legislature issued these bonds in violation of the .constitutional provision prohibiting an increase of the public debt. The issuing the bonds was an increase of the debt, if the payment of them could be enforced. But whatever is done in violation of a prohibitory law is null and can have no effect. C. C. art. 12; 23 An. 267; State ex rel. Samuel Smith vs. the State Treasurer. *Ab initio,* they were null, and no vitality or force could be infused into them by their falling into the hands of third holders. Instruments of the kind have not the essential properties of promissory notes under the law merchant, and even securities of the latter kind are vitiated in the hands of *bona fide* holders before maturity and without notice, when the consideration is unlawful. Parsons on Notes and Bills, vol. 1, pages 212 and 213.

I concur in the decree just read.

———

LUDELING, C. J., *dissenting.* The evidence in this record shows that the intervenors acquired the bonds in question in due course of trade, for value, in good faith, and before maturity.

· The act No. 26 of the General Assembly of 1869 authorized the bonds of the New Orleans, Mobile, and Texas Railroad Company to be guaranteed by the State, on certain conditions.

The act No. 31 of the General Assembly of 1870 authorized bonds of the company to be indorsed for a branch road to Shreveport. Both these acts were enacted before the adoption of the constitutional amendment limiting the State debt. This amendment was ratified by a general election, in November, 1870. So that the obligation of the State to

indorse the bonds of said company, on certain conditions, existed when the constitutional amendment was adopted.

Act No. 95 of the General Assembly of 1871 authorized the Governor to issue the bonds of the State in lieu of indorsing the bonds of the company, on condition that the company would release the State from its obligation to indorse and issue certificates of stock of the company to the State for the amount of the State bonds. In other words, it authorized the Governor to substitute the bonds of the State, instead of indorsing bonds of the company to a like amount, if the company would issue to the State certificates of stock. Certainly this did not create a debt; it was the substitution of one obligation for another, and was not prohibited by the constitution. The debt was the same, the *evidence* of it was changed. 23 An. 405, 622; 26 An. 561.

But it is said the conditions imposed on the company were not per-formed before the adoption of the amendment. That fact might be im-portant if the company were claiming the bonds or their payment. But Williams & Guion are innocent third holders of the bonds, which are negotiable in their character, and whether the conditions were performed or not, they had a right to presume that they had been performed, and that the bonds were regularly issued.

It seems to me that the rule is universal that where the power to make the obligation exists, and the law under which the bonds are issued author-izes the officers who sign them to execute them, and the bonds purport on their face to have been issued in pursuance of the statute, the *bona fide* third holder is protected, whether the conditions imposed on the party in whose favor the bonds issued have been performed or not. 21 How. 545; 9 Wall. 414; 1 Wall. 93, 393, 297; 5 Wall. 784; 7 Wall. 82, 619; 13 Wall. 297, Pendleton Cy. vs. Amy.

I therefore dissent from the opinion of the court.

Rehearing refused.

*Carried by writ of error to the Supreme Court of the United States.